37099. FARR *v.* UNITED STATES FIDELITY & GUARANTY COMPANY *et al.*

608

*Otis L. Davis, Paul Webb, Jr., Bertram S. Boley,* for plaintiff in error.

*M. D. McLendon, Bryan, Carter, Ansley & Smith,* contra.

FELTON, Chief Judge. The defendants contend that the evidence is insufficient to show that the claimant notified his employer of the accident as required by law. In a deposition the claimant fully testified that he had given such notice. However, in his testimony at the hearing, he did not testify as to any notice given to his employer. The question is whether or not the deposition was in evidence so that the testimony contained in the deposition concerning such notice was before the board in their consideration of the case. The deposition was certified to the superior court as being a part of the record in the case and is also a part of the record in the case as it stands before this court. After a careful examination of the entire record, it appears that the deposition was received in evidence and was before the director and the full board upon their consideration of the case, and since there was testimony in the deposition to the effect that the required notice had been given by the claimant to the employer, a finding that such notice had actually been given was authorized.

In his finding of fact the single director found that the claimant "sustained an accident and injury which arose out of and in the course of his employment while handling heavy freight when a drum or barrel he was handling fell against him and injured him or aggravated a pre-existing condition which claimant had suffered for some time." The director found further that the "strain and handling this heavy barrel aggravated this [pre-existing] condition to the extent that the claimant is now totally disabled." The defendants contend that the director and the board did not make a valid finding of fact because they found in the alternative that the claimant either suffered an original injury or an injury which aggravated a pre-existing condition. Where the evidence only authorizes one of such findings a director or the board cannot make an alternative finding. However, where there is evidence that will support a finding that the claimant either suffered an original injury or an injury which aggravated a pre-existing condition, a finding in the alternative is not invalid. The testimony of three doctors was in evidence. There was medical evidence which authorized a finding that the claimant suffered a strain of muscles in the lower region of his back wholly disconnected with any pre-existing condition. There was other medical evidence to the effect that the claimant was suffering from arthritis and that the injury could have aggravated the existing arthritic condition to cause the pain and disability suffered by the claimant. In view of such medical testimony the board's finding that the claimant either suffered an original injury or suffered an injury which aggravated a pre-existing condition was authorized.

The defendants further contend that certain hypothetical facts were not substantiated by the actual facts as they appeared in the evidence. One such discrepancy was that in the hypothetical question it was stated that the barrel fell against the claimant knocking him against the back of the truck, whereas the evidence showed that the barrel knocked the claimant against the side of the truck. This discrepancy was inconsequential and could not have had any bearing whatsoever on the doctor's answer to the hypothetical question as a whole. The other discrepancy was that the hypothetical question contained the fact

that upon being struck by the barrel the claimant suffered an immediate pain and that he continued to suffer such pain throughout the rest of the day, whereas the actual facts show that the claimant suffered an immediate pain upon being struck by the barrel but such pain subsided and the claimant did not experience any pain the rest of the afternoon and pain did not recur until some hours later. This variance was also inconsequential and had no bearing on the answer given in response to the hypothetical question, as there was medical evidence that the claimant could have suffered a valid injury in the manner described and suffered only momentary pain at the time of the happening: "Q. And assuming that he had pain, just momentary pain at the time the barrel slipped, and he went on that same afternoon to five different places picking up large boxes of freight and had no pain, and went back to the warehouse, and with the assistance of other employees, and in the usual course of his employment, unloaded his truck and drove on to Villa Rica, Georgia, and claimed to have had no pain that night. Would you consider that he had any severe strain on November 30th, 1956? A. He could have. For instance, in this strain or whiplash neck injury where the spine is thrown, sometimes we don't see much discomfort for a few days afterwards."

The evidence authorized a finding that the defendant at the time of the hearing was suffering a temporary total disability. There was medical evidence that the claimant was 95 percent disabled from doing the type of work he was employed to do at the time of his injury. The claimant testified that he could not do any lifting of any sort and could not find any work which he could do with his existing injury. This evidence was sufficient to authorize the finding as to temporary total disability.

Since there was evidence to support the awards of the single director and the full board, the court erred in reversing the award and in remanding the case for a de novo hearing.

*Judgment reversed. Quillian and Nichols, JJ., concur.*

ON MOTION FOR REHEARING

In their motion for rehearing, the employer and carrier contend that the evidence showed "that plaintiff was rendering services for which he received compensation at the time of the

trial. Plaintiff's duties were in the nature of a watchman, where he was required to walk about over a farm to protect the owner's property against theft. As compensation for his services, the plaintiff was furnished rent and the payment of his light bill of approximately $5 per month." This matter was considered by the court when rendering its opinion but it was not deemed of enough importance to be specifically discussed. We do not think the evidence demanded a finding that the claimant was employed and received compensation as an overseer or night watchman. Concerning this matter, the claimant testified, "Q. Now, what have you done since you left Barnes Freight Lines? A. I haven't done a thing, only 'mope' around, just 'mope' around, that is all. Q. You haven't worked anywhere? A. No, sir. Q. Are you living on a farm now? A. I am living in Mr. Dyer's house, he just give me the rent and light bill and all, and the milk and butter, my wife can milk the cows to stay around down there and just walk around, that is all the doctor told me, just walk around and try to build my muscles back up, that is all I do, my wife does the milking, what little milking we have done. Q. Do you do any work at all? No, sir, I don't do a thing, only just walk around amongst the cattle and all. Q. You mean he has cattle there and you are sort of an overseer of the place, is that what it is? A. No, sir, he just give me the place just to live there and keep anybody from coming in there and tearing up his house, he has got a nice house there, that is all I do, he just give me the rent. Q. How many cows does he have? A. I don't know how many cattle he has got, they are all in a pasture. Q. Can you give us some idea about how many? A. I would say about 130, just beef type cattle, that runs in the pasture. Q. Do you feed those cattle? A. No, sir, I don't feed them. Q. Don't have to give them any feed at all? A. No, sir, he comes down there and does that, he gives them hay twice a week. Q. You never have fed them? A. No, sir, I don't have nothing to do with the feeding. Q. You live in his home? A. I live in his tenant house, yes, he lives in Villa Rica. Q. Does he pay you anything? A. No, sir. Q. Now, how long have you been out there on his place? A. Moved there the 23rd day of December, 1956. Q. Is your back im-

proving now, Mr. Farr? A. Not much, it hurts me all the time and these pains from here (indicating) runs down in this crippled hip and it just hurts me all the time. Q. It is some better than it was? A. Well, I can walk a little better than I could, yes. Q. And all you do over there at this place where you are living now is just walk around? A. Just walk around on the pasture, the doctor told me to just walk around, said it would help them muscles and maybe get them back quicker. Q. How many hours a day do you spend walking around? A. I would say two or three hours, not over the pasture but walking altogether. Q. How many acres does he have there? A. A little over two hundred acres is what he told me, I don't know exactly how much, that is what he told me, I can stand in the yard and see ever bit of it, the cows and everything. . . Q. And how many rooms do you have on this farm? A. I have five rooms. Q. Now, you are paid your rent out there, aren't you, you don't have to pay rent, do you? A. No, sir, not a penny rent. Q. And you are out there to sort of oversee the farm and look after the farm, aren't you? A. No, sir, I am not out there for that. All I do is, he gives me the rent to keep people from coming in carrying the stuff off, he let me do that for the shape I was in. Q. And you walk around over the farm? A. I walk around over the pasture, hobble around, sure do. Q. And that's the job you were given to do? A. Just keep people from coming in on the farm. Q. And he gives you your milk, butter, and what about eggs? A. He gives that to the wife and children, if they would milk the two cows, they could have all the milk and butter they wanted. Q. And you didn't tell me that he gave that to your wife, when I took your deposition, did you? You just told me he gave you milk and butter, and— A. That's all he told my wife. He told her she could have the milk and butter for milking the cows. Q. When did that conversation take place? A. Well, it was the second day of January when he came down and told her that, if I am not mistaken. Q. Well, now, when you talked to him at the beginning about going out there on the farm, isn't that the arrangement you had made with him at that time, Mr. Farr? A. No, sir, just went and asked him to come down to the house, told him I could not pay

the rent at Villa Rica, and asked if I could go out there and live. We had known one another all our lives, and he said he would be glad for me to go out there. Q. And he pays your light bill? A. Yes, sir, up to five dollars light bill. Q. Is that about what it runs? A. About what it runs. Q. What about eggs, do you get eggs out there? A. No, sir. Q. Meat, vegetables? A. No, sir."

The board was authorized to find that under this arrangement the claimant was not employed for wages but that the claimant was allowed to stay on the farm because of "the shape" he was in, merely out of the charity of the owner of the farm and that the owner merely received the incidental benefit that the claimant's presence there would deter vandalism and thievery. In other words the board was authorized to find that the claimant was not an employee of the farm owner and received no wages or compensation as such for staying on the farm.